BROWN et al. v. PEGRAM.

(Circuit Court of Appeals, Third Circuit. October 30, 1903.)

No. 46.

1. NEGOTIABLE INSTRUMENTS—NOTES GIVEN FOR PATENT RIGHTS INDICATING CONSIDERATION.

Act Pa. April 2, 1872 (P. L. 60) § 1, providing that, when a negotiable instrument is given in consideration of patent rights, the words "given for a patent right" shall be put on the face thereof, and the instrument in the hands of any purchaser or holder shall be subject to the same defenses as in the hands of the original owner or holder; and section 2, providing that if any person shall take or transfer a negotiable instrument not having such words on its face, knowing that the consideration was patent rights, every such person shall be guilty of a misdemeanor—does not make void a negotiable instrument given for such a consideration without such words on its face, or affect the right of recovery thereon of a bona fide purchaser without notice of its consideration.

2. SAME—ACTION BY PLEDGEE—CREDITING MONEY RECEIVED FROM THIRD PERSON.

The pledgee of a note in an action against the maker need not credit money received by him from a person who was only secondarily liable on a guaranty of payment of the pledgor's debt.

In Error to the Circuit Court of the United States for the Eastern District of Pennsylvania.

For opinion below, see 122 Fed. 1000.

Reynolds D. Brown, for plaintiffs in error.

Richard C. Dale, for defendant in error.

Before ACHESON and GRAY, Circuit Judges, and McPHERSON, District Judge.

J. B. McPHERSON, District Judge. This case was tried without a jury, and the following facts were found by the court:

"The plaintiff adduced in evidence a promissory note dated December 12, 1901, for $20,000, payable June 10, 1902, at 817 Drexel Building, Philadelphia, signed, 'American Alkali Company. A. K. Brown, President. Clayton E. Pratt, Treasurer.' This note was payable to the order of the American Alkali Company, and was indorsed by the same officers of that company who had signed it. It was protested upon June 10, 1902. The plaintiff also adduced in evidence a like note for $30,000, bearing the same date and payable at the same time as the note above mentioned, and in like manner executed, indorsed and protested. By this proof the plaintiff established a prima facie right to recover the amount of said notes, with interest and costs of protests. This is not questioned, and, as respects the defense it is said in the defendant's brief, that 'the plaintiff's requests for findings of fact cover the material facts in the case, and defendants concede them all,' with two 'qualifications,' which, as they do not challenge the correctness of the statements of fact to which they relate, but merely present the claims of the defendants as to their effect, need not be at this point considered. I accordingly find the following facts:

"(1) The American Alkali Company is a corporation organized under the laws of the state of New Jersey, and has its principal office in the city of Camden, N. J. It also maintains an office in the Drexel Building, in the city of Philadelphia.

"(2) By agreement in writing dated May 6, 1899, the American Alkali Company agreed to purchase from the Commercial Development Corporation, Lim-

125 F.—37

ited, organized under the laws of Great Britain, letters patent of the United States Nos. 608,300 and 501,783, dated respectively August 2, 1898, and July 18, 1893, and also letters patent of Canada No. 61,368, and to pay in consideration for the assignment therefor four hundred and seventy-nine thousand nine hundred and sixty shares of the common stock of the American Alkali Company, full paid and nonassessable, and $1,000,000, payable as follows: One accepted bill at not to exceed one hundred and eighty days for $100,000, a note or notes made by the company to its own order and indorsed by the company, and at not later than June 1st, and for $500,000, and four accepted drafts at not to exceed twelve months for $100,000 each.

"(3) Among the accepted drafts thus given was one for $100,000, dated May 18, 1899, payable twelve months after date. When this matured, $50,-000 in cash was paid on account and two new drafts were given, one for $32,000 and another for $20,000. These matured in May, 1901, and were renewed by two drafts of like amount, which were the drafts hypothecated by the Commercial Development Company to the plaintiff on November 5, 1901. These were not paid at maturity, but were renewed by the drafts in suit, which bear date December 12, 1901, and matured June 10, 1902.

"(4) The contract of May 6, 1899, was executed at the office of the American Alkali Company in Philadelphia, and the drafts and notes were there executed. In the negotiations the Commercial Development Corporation, Limited, was represented by A. R. Harvey, its attorney in fact, and a managing director specially authorized to act in the premises. Authority for the execution of the contract and the issue of the drafts referred to therein was given at a meeting of the stockholders of the American Alkali Company held May 5, 1899, at its office in Camden, N. J.

"(5) About the 1st of November, 1901, Thomas Pegram, residing in Liverpool, England, was requested to make a loan to the Commercial Development Corporation, Limited, of £10,000. The application was made through a solicitor, Mr. Alderman Fred Smith, senior partner of the firm of Grace, Smith & Hood, and a magistrate of Liverpool. The statement was made that the loan of £10,000, was but for a short time, and that as collateral Mr. Pegram should receive the rights of the Commercial Development Company under a contract with a firm named Perrins, Limited, any funds coming to the Commercial Development Company from the flotation of certain Spanish tin mines, and the American Alkali bills for $52,000. After a negotiation lasting a few days, on November 5, 1901, the plaintiff loaned the Commercial Development Corporation Company, Limited, £10,000, giving them his check for that amount on Lloyd's Bank, Limited, of Liverpool, which check was forthwith presented and paid in due course. To secure the loan the Commercial Development Company, Limited, executed a writing under date of November 5, 1901, reciting that in consideration of the sum of £10,000 paid them they hypothecated in favor of Pegram, first, the sum of $52,000, payable in respect of the two bills of exchange dated the 15th April, 1901, for $32,000 and $20,000, respectively, payable to the order of the American Alkali Company and endorsed by it, and, second, the moneys payable to us in respect of the flotation of the Spanish Tin Mining Company, and undertaking to pay the said sum of $52,000, and the said moneys payable in respect of the flotation of the said Spanish Tin Mining Company immediately upon receipt of the same to the extent of £10,500.

"At the date of this transaction the Alkali bills of exchange above mentioned were in the possession of Messrs. Chapman & Co., bankers of New York, for the account of the Commercial Development Company. On December 10, 1901, $2,000 was paid on account thereof by the American Alkali Company to Messrs. Chapman & Co., and the notes in suit were given for the balance of $50,000. Mr. Pegram received no part of the $2,000 which was paid by Chapman & Co. to the Commercial Development Company. Subsequently, upon hearing of these facts, the plaintiff took the notes in suit out of the hands of Chapman & Co., and placed them in the hands of the Canadian Bank of Commerce, to be held for his own account.

"In making the loan to the Commercial Development Company the plaintiff had no notice or information that the consideration for the American

Alkali bills was the assignment of the letters patent above mentioned. The loan was made in good faith, and with nothing to impair the plaintiff's rights as a purchaser for value without notice.

"(6) Under date of December 5, 1901, A. R. Harvey executed a writing in favor of the plaintiff, in words following:

" 'In consideration of your not requiring payment forthwith of the sum of £10,500 due to you from the Commercial Development Corporation, Limited, I hereby guarantee the payment by them to you of the said sum of £10,500 on the fifth day of January, 1902.'

"On January 9, 1902, a further writing as follows:

" 'In consideration of your not requiring payment forthwith of the sum of £10,500 due from the Commercial Development Corporation, Limited, to you, I hereby consent to your extending the time for payment of the said sum and to the corporation giving you further security for the same.'

"And on April 29, 1902, a further writing as follows:

" 'In consideration of your extending the time for payment by the Commercial Development Corporation, Limited, of the sum of £11,000 to the 7th proximo I hereby guarantee the payment by them to you of the said sum of £11,000 on the 7th proximo, but this guarantee is not to be enforced before the 12th day of June next.'

"And on April 30, 1902, Ruth L. Harvey, the wife of A. R. Harvey, executed writings in words following:

" 'In consideration of your extending the time for payment by the Commercial Development Corporation, Limited, of the sum of £11,000 to the 7th proximo I hereby charge all my interest in "Ramleh" (exclusive of the charge of £4,500 already upon it), and also the furniture and fixtures upon which there is no charge. I also undertake that no charge will be made upon "Ramleh," or upon the said furniture and fixtures, and that I will not remove or disturb anything at Ramleh between the present date and the 12th day of June next.'

" 'In consideration of your extending the time for payment by the Commercial Development Corporation, Limited, of the sum of £11,000 on the 7th May, 1902, I hereby guarantee the payment by them to you of the said sum of £10,750 on the 7th May, 1902, but this guarantee is not to be enforced before the 12th day of June, 1902.'

"(7) In June, 1902, the Commercial Development Company was placed in the hands of a receiver and liquidator, and out of that receivership the plaintiff realized ninety pounds on account of the indebtedness. As against the amount thus realized he paid out in sundry expenses connected with the receivership and keeping the corporation in life £400.

"In September, 1902, the plaintiff received the check of Mrs. Ruth L. Harvey for £6,000 on account of her guaranty. In part, at least, this represented the proceeds of the sale of certain chloride shares which the plaintiff had obtained from W. W. Gibbs on account of an obligation of W. W. Gibbs to A. R. Harvey which had come into the plaintiff's possession in the course of the dealings. To what extent this check for £6,000 in fact represents moneys of Ruth L. Harvey and to what extent moneys of A. R. Harvey, the plaintiff was unable to state.

"Other than the moneys herein stated, the plaintiff has received nothing on account of the loan made by him to the Commercial Development Company on November 5, 1901, either by way of payment or in realization of any of the collaterals.

"The defendant admits that the plaintiff is entitled to recover the balance now due to him by the Commercial Development Company, Limited, on account of his loan of ten thousand pounds to that company, made November 5, 1901; but insists that the plaintiff's claim to recover the full amount of the notes sued on cannot be sustained, because neither they nor any of the preceding drafts of which they constitute renewals had the words 'Given for a patent right' written or printed on their face, although the original draft of the series was in fact part of the consideration for a purchase of patent rights. This insistence rests upon a statute of Pennsylvania, as follows:

" 'An act to regulate the execution and transfer of notes given for patent rights.'

" 'Section 1. Be it enacted by the Senate and House of Representatives of the Commonwealth of Pennsylvania in General Assembly met, and it is hereby enacted by the authority of the same, that whenever any promissory note or other negotiable instrument shall be given, consideration for which shall consist in whole or in part of the right to make, use, or vend any patent invention or inventions, claimed to be patented, the words, "Given for a patent right," shall be prominently and legibly written or printed on the face of such note or instrument, above the signature thereto; and such note or instrument, in the hands of any purchaser or holder shall be subject to the same defences as in the hands of the original owner or holder.

" 'Sec. 2. If any person shall take, sell, or transfer any promissory note or other negotiable instrument, not having the words "Given for a patent right," written or printed legibly and prominently on the face of such note or instrument above the signature thereto, knowing the consideration of such note or instrument to consist in whole or in part of the right to make, use, or vend any patent invention or inventions claimed to be patented, every such person or persons shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be fined in any sum not exceeding $500, or imprisoned in the county jail not exceeding sixty days, or both, in the discretion of the court.' "

P. L. 1872, p. 60.

The decision of the case was put upon the point that the act of 1872 violated the Constitution of the United States, because (to use the language of the circuit judge) "the monopoly which a patent grants is a property right created under the Constitution and laws of the United States, and by those laws made assignable; and therefore a state law which prescribes that negotiable instruments in the ordinary form shall not be given or accepted for an assignment of the patent itself is as plainly obstructive of the exercise of a right vested by the federal law as would be the inhibition of payment in the current funds upon the sale of a patent for cash." We express no opinion concerning the correctness of this ruling, believing that the case may be properly decided upon another ground, namely, upon the true construction of the Pennsylvania statute.

The attack made by the plaintiffs in¹ error upon the notes in suit depends wholly upon the effect that should be given to the second section of the statute. The argument may be stated in these words: The second section declares it to be a misdemeanor, punishable by fine or imprisonment, or both, if any person, with knowledge that a negotiable instrument has been given in whole or in part for a patent right, shall take, sell, or transfer such instrument, unless the words "Given for a patent right" appear upon its face. Therefore, upon familiar principles, since it is a crime to make such an instrument, the instrument itself is void in the hands of the original payee; and, even in the hands of a bona fide pledgee, who is therefore a purchaser for value, it is so far invalid that it may only be enforced to recover whatever balance may be still unpaid. We are unable to assent to the soundness of this argument, and believe that further consideration of the statute and of the Pennsylvania decisions thereon will show satisfactorily that a different conclusion should be reached. The act was first considered by the Supreme Court of Pennsylvania in Haskell v. Jones, 86 Pa. 173. The opinion of the court was delivered by Mr. Justice Sharswood, and is as follows:

"If the act entitled 'An act to regulate the execution and transfer of notes given for patent rights,' passed April 12, 1872 (P. L. 60), makes absolutely void all such notes in which the words 'Given for a patent right' are not prominently and legibly written or printed on the face of such note above the signature thereto, there would be great reason for the contention that the act is unconstitutional and void. No state can so interfere with the right of a patentee, secured to him by the acts of Congress, to sell and assign his patent. But such is not the operation of the act, according to its letter and spirit. By the express provision of the statute the only effect of the insertion of such words is that 'such note or instrument in the hands of the purchaser or holder shall be subject to the same defenses as if in the hands of the original owner or holder.' By necessary implication, notes without such words inserted in them remain on the same footing as before the act. The sole object of the Legislature was to secure, so far as could be done consistently with the rights of innocent third persons, that notice of the consideration should be given to all who should take the paper. Nothing is better settled than that between the original parties to a note given for a patent right it is a good defense to show that the alleged patent is void; in other words, that it is no patent right at all, and that the consideration has therefore entirely failed. Bellas v. Hays, 5 Serg. & R. 427, 9 Am. Dec. 385; Geiger v. Cook, 3 Watts & S. 266; Holliday v. Rheem, 6 Harris, 465, 57 Am. Dec. 628. All who take with notice of the consideration, take necessarily subject to the same defense. There is nothing in all this which interferes with any just right of the holder of a valid patent under the acts of Congress, nor that the maker of the note shall be permitted to show against a holder with such notice that it was obtained by fraudulent misrepresentation. This very plainly distinguishes our act from the statutes of other states which have been held unconstitutional.

"To secure the insertion of these words, the second section of the act makes it a misdemeanor, punishable by fine or imprisonment, or both, for any person 'knowing the consideration of a note' to be the sale of a patent right to take, sell, or transfer it without the words 'Given for a patent right' inserted, as provided by the act. It is too plain for argument that this section in no way affects the right or title of the holder of such a note who takes it, not knowing that the consideration was the sale of a patent. He commits no illegal or indictable offense. The negotiability of a note in which the required words are not inserted is in no way affected by the act. The innocent holder, who takes it before maturity for value, without knowledge or notice of the consideration, takes it as heretofore, clear of all equities between the original parties."

In Hunter v. Henninger, 93 Pa. 373, the court again said:

"The act of 12th April, 1872, was intended to destroy the negotiable character of notes given in whole or part for 'the right to make, use, or vend any patent invention,' in order that the makers thereof might have the right to defend as well when said notes were passed to third parties as when in the hands of the original payees. In furtherance of this intent, the act requires the indorsement, 'Given for a patent right,' to be made across the face of such notes; and this in order that no one may ignorantly purchase paper of this kind. Without this, of course, the innocent purchaser for value would not be affected. He would hold as the indorsee of any other negotiable paper. Not so, however, as to one knowing the consideration of a note given for a patent right, for such a one is, by the act, guilty of a misdemeanor, if he receives this kind of paper without having the words above stated written upon its face."

The only other decision upon the subject is Shires v. Commonwealth, 120 Pa. 368, 14 Atl. 251, which adds nothing of present value to the previous cases. The brief per curiam opinion is as follows:

"There is nothing in the act of April 12, 1872, which infringes the Constitution of this commonwealth, nor do we think it conflicts with the federal Constitution. As a police regulation the statute has proved itself to be valuable in that it has been the means of preventing gross frauds upon our

citizens, to which, before its enactment, they were subjected. Under these circumstances we are not disposed to pronounce this law invalid."

As we understand these decisions, the result is that a note made in violation of the statute is not void in the hands of any holder whatever, whether he be the original payee or a subsequent innocent indorsee or pledgee. To take the position that the note is made wholly void by the statute is, we think, to overlook the necessary effect of the first section. This declares in plain language that whenever a negotiable instrument shall be given for a patent right the words "Given for a patent right" shall be put upon the face of the instrument, and that a negotiable instrument thus marked shall, in the hands of any purchaser or holder, be subject to the same defenses as in the hands of the original owner or holder. The object of the statute is thus declared, namely, to destroy the negotiable character of the instrument, and there is nothing expressed to warrant the conclusion that the Legislature intended to make the instrument void altogether. Neither should such a conclusion be readily implied, for the mischief at which the act was aimed was fully remedied by preserving whatever defenses the maker might have against the original payee. If the maker had been tricked or defrauded into making the note, or if a spurious or worthless patent had been foisted upon him by a clever knave, he was fully protected (if the act was obeyed, and the paper was marked) by permitting him to prove the fraud or failure of consideration against the title of any holder whatever. But, to deal fairly with subsequent purchasers, it was necessary to put them upon notice. Clearly, if the paper were unmarked in ordinary negotiable form, an innocent purchaser would take an indefeasible title, and therefore it was required that the paper should carry with it a plain notification to the world that unknown defenses might exist. With both reasons in mind—the protection of the maker, and notice to subsequent purchasers—the second section was added, in order that the command of the first section might have the sanction of the criminal law, and therefore be less frequently disobeyed. To suppose that the legislature intended to make void a negotiable instrument given for a valid patent in a perfectly fair transaction, an instrument to which no defense whatever could be interposed, simply because by mistake or ignorance or carelessness the words "Given for a patent right" do not appear upon the instrument, is a supposition not easily to be entertained. We should only be willing to accept such a construction of the statute because we could find no other, and were left no alternative by the plain direction and positive language of the Legislature. As it seems to us, no such situation is presented. The two sections of the act are to be taken together, and when they are thus considered and are read in the light of the construction adopted by the Supreme Court of the state they lead naturally and without difficulty to the conclusion already stated—that the act does not make the unmarked negotiable instrument void, and goes no further than to save the defenses of the maker in two instances: First, where the note is marked as required by the first section; and, second, where it is sued upon by any person who takes it subsequently, with knowledge that the consideration was in whole or in part the right to make,

use, or vend any patented invention, or invention claimed to be patented.

If this conclusion is correct, the foundation of the defense is destroyed. No defense against the original drafts is suggested other than the argument, already considered, that the second section of the act made them void, and no other defense is suggested against the renewal notes in suit. It follows that the defendant in error was entitled to the full amount of his claim, for upon a valid obligation of the maker, who was also the primary debtor, the pledgee was certainly not bound to credit the money that he had already received from another person, who was only secondarily liable, upon a separate and collateral undertaking. Whether, even if the drafts had been void in the hands of the original payee, the defendant in error would have been obliged to give credit for this money, is a question upon which we are not called upon to express an opinion.

The judgment of the court below was right, and is now affirmed, with costs to the defendant in error.